IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

REYES LEGRANDE, JR,

    Petitioner,

  v.

JAMES A. YATES, Warden of Pleasant Valley State Prison,

    Respondent.

No. C 07-01793 WHA

**ORDER DENYING WRIT OF HABEAS CORPUS AND CERTIFICATE OF APPEALABILITY**

**INTRODUCTION**

This is a habeas action filed by a California state prisoner pursuant to 28 U.S.C. 2254, challenging his 2004 conviction in Santa Clara County Superior Court. Respondent James A. Yates, Warden of the Pleasant Valley State Prison where petitioner is incarcerated, opposes the petition. Petitioner has filed a traverse. For the reasons set forth below, the petition is **DENIED**.

**STATEMENT**

Following a trial in April and May 2004, a jury found petitioner Reyes LeGrande, Jr. guilty of all counts charged against him, including (1) assault with a semiautomatic firearm with an enhancement for personal use, (2) assault with a firearm with an enhancement for personal use, (3) possession of a firearm by a felon, (4) transportation of methamphetamine with a probation ineligibility allegation for a prior drug conviction, (5) possession of methamphetamine for sale with a probation ineligibility allegation for a prior drug conviction, (6) possession of a false compartment with intent to store, conceal, smuggle, and transport a controlled substance, (7) unlawful possession of a controlled substance containing

methamphetamine while armed with a loaded, operable firearm, (8) carrying a concealed firearm in a vehicle, without a license, by a felon, (9) carrying a concealed and loaded firearm by a person not listed as the registered owner of the firearm, (10) carrying a loaded firearm on one's person, or in a vehicle, while in a public place, by a felon, (11) carrying a loaded firearm on one's person, or in a vehicle, while in a public place, by a person to whom the firearm is not registered and (12) personal possession of a loaded, operable firearm while under the influence of methamphetamine (Exh. A-3 at 492–96, 530–44).

Petitioner was also charged with enhancements under California Penal Code § 12022.1 for committing Counts 4 through 12 while released on bail, and with enhancements attached to Counts 4 and 5 under California Health & Safety Code § 11370.2(c) for prior drug convictions. On May 4, 2004, petitioner admitted as true to the trial court the prior drug conviction enhancements as to Counts 4 and 5 (Exh. A-3 at 493–94). He also was advised of and waived his right to a jury trial as to the on-bail enhancements (*id.* at 494). At a court trial on May 21, 2004, the trial court found true all the on-bail enhancements (*id.* at 564).

**1.   THE ROBERT BOLLI SHOOTING AND SEARCH OF DEFENDANT'S RESIDENCE.**

Counts 1 through 3 against defendant arose from the shooting of Robert Bolli on October 23, 2000, and subsequent search of defendant's residence on December 7, 2000. The following background facts describing those events are taken verbatim from the opinion of the California Court of Appeal:

> On October 23, 2000, at 8:10 p.m., San Jose police officers responded to the home of Timothy Leach in response to a report of shots fired and a small vehicle leaving the scene at high speed. Three men whom Leach did not know had driven up and were shouting at and kicking Robert Bolli, who was there working on a car. The first got out and argued with Bolli; the second got out and "jumped" him, and the third, later identified as defendant, got out wearing a dark ski mask with a "[s]ilver or shiny" "automatic-style gun" and fired six shots. Then all three got back into the vehicle and fled.
>
> Leach's next-door neighbor, John Sullivan, saw someone working underneath a car near Leach's house and two or three other men standing around. As Sullivan looked on from his driveway about 10 feet away, a car pulled up and double-parked in front of Sullivan's house. Two men got out, the driver first. The driver did not have anything in his hands. He approached the man working on the car and began yelling at him. The man yelled back, saying

2

something about a motor. The driver tried to kick the man who was working on the car. The person under the car slid forward a little but did not get up.

Then a second person got out of the car. He was wearing a black mask and was carrying a silver gun in front of himself. Sullivan immediately entered his house. He heard several shots in quick succession. Sullivan called 911 and went back outside, but everyone was gone. About 20 to 30 minutes later, Sullivan spoke with the police. He told the interviewing officer he had seen three Hispanic males arrive in the car, and that one got out and began to argue with someone; a second got out and jumped on the person the first person had been arguing with, and the third person, carrying the handgun, got out and fired six shots into the air. Then the threesome got back into the car and left the scene. Sullivan was unable to make a positive identification of any of the suspects.

Bolli spoke with Detective Jason Ta at the county jail on November 13, 2000, after Bolli had been arrested on an outstanding warrant. Ta wanted to know if Bolli had anything to do with the theft of a .40-caliber Sig Sauer handgun from a San Jose police officer. Bolli denied any involvement in the theft of the weapon, but mentioned that he had been injured in an October 23 shooting at Timothy Leach's house. Ta testified that before that, police were unaware that Bolli had been shot during that incident. Bolli said he was fixing some wiring under the dashboard of a car he was repairing at Leach's house with a very bright 500 watt halogen light pointed at his face when he was pulled out of the car by a suspect who kicked him in the head. He heard somebody accusing him of stealing a motor. Then someone kicked him in the head repeatedly. He did not know who assaulted him, partly because he had been looking at the bright light, and because he became unconscious. However, Bolli told Ta he knew that the dispute was related to a house belonging to the Oliver family at which he had been staying with defendant, so he concluded that Gustavo Oliver was involved in yanking him out of the car. After October 23, Bolli heard that defendant had told Bolli's attackers that Bolli had stolen a motor.

Ta testified that Bolli told him that his assailants were Gustavo and Edgardo Oliver. He said that Gustavo pulled him out of the car and kicked him in the head a couple of times.

Bolli stated that defendant, whom he mentioned by name, shot at him. Defendant shot six rounds from a semiautomatic pistol, four of which went by Bolli, and the other two hit the ground and ricocheted into pieces causing shrapnel and pebbles to hit Bolli in the legs and injure him. Bolli stated one fragment of a bullet hit his leg by the ankle. He pulled it out and did not request medical attention. At trial he stated that there were "like, 80 pieces of lead in my legs, little pieces . . . in both legs . . . [T]hey were only, like, pretty much skin deep, like getting shot with a shotgun from far range . . . I pulled them out with tweezers. I didn't bother going to the hospital. I had warrants." Bolli showed the marks to Detective Ta, who photographed them.

3

Bolli also said that he knew defendant was the shooter because he recognized defendant's voice when defendant directed the suspects to take the motorcycle he had given Bolli in payment for some mechanical work Bolli had done for him. Bolli saw defendant's face when he crossed the street and removed the ski mask he was wearing. Three days later when Ta asked Bolli if he could identify a photograph of the person who had shot him, Bolli picked defendant's photo from a photo display. At that time, Bolli told Ta that defendant used a nine-millimeter Glock which he owned. At trial, Bolli admitted he told Ta defendant had used the nine-millimeter Glock but he denied knowing whether defendant owned one.

At trial, however, Bolli testified that he had been using a lot of marijuana and was addicted to methamphetamine, using "a lot," maybe one or two grams worth about $50 to $100 per day. He stated that his addiction to methamphetamine affected what he told Ta. He stated that he was angry at defendant because defendant had bought a new house and had abandoned him. Earlier, when Bolli had nowhere else to stay, defendant had let Bolli stay with him rent free for a few months in a house owned by Gustavo Oliver's family on Blue Mountain Road in East San Jose. However, defendant asked Bolli to leave when he believed Bolli had stolen a motor. Bolli was then forced to pay rent, which he could not afford. Meanwhile, defendant moved to a house on Mount Madonna. Bolli was angry because defendant had moved on with his life whereas Bolli became homeless. Bolli said he blamed defendant for his misfortune. Bolli said he was also upset with defendant because he had falsely accused Bolli of the theft of the motor. Bolli said he wanted to retaliate against defendant. Bolli was upset with Gustavo Oliver as well, but that was because he had been told that Gustavo Oliver had hit Bolli in the head.

Bolli denied telling Ta that defendant accompanied the Oliver brothers to Leach's residence. He said he had only been told that defendant was present and he could not remember who told him that. He stated that when he was kicked in the head, he became unconscious and remained so during the entire assault. Bolli testified he did not know who assaulted him, but that if Detective Ta's report said that he had told Ta that defendant was present, then Bolli must have said it. However, Bolli testified that he probably did tell Ta that defendant was the person that had shot him, but his statement to Ta was not based on anything he had heard; he just made it up. Bolli testified he was aware that the dispute related to the house where he had been living, so he concluded that Gustavo Oliver was involved in yanking him from under the car.

After the assault, Bolli heard that defendant had told Bolli's attackers that Bolli had stolen a motor. Bolli acknowledged telling Ta that defendant told the Oliver brothers that Bolli stole the motor. Bolli testified that at the time he talked to Ta, he was facing a state prison sentence and he thought that he might go free if he provided information to law enforcement. The story about the parties involved in the October 2000 incident was fabricated. He said he made up the story about Gustavo Oliver pulling him out from under

4

the car. He said he could not remember what he told Ta, but it was "a bunch of crap."

On December 7, 2000, at 8:00 a.m., Ta served a search warrant on defendant's residence. Three people lived there, defendant, Gustavo Oliver, and defendant's girl friend, Renee Ammerman. The search warrant listed a .40-caliber semiautomatic weapon as an object of the search because that was the only type of weapon that could leave behind the type of casings and the markings on the casings found at the scene. Ta did not find a .40-caliber semiautomatic gun, but did find a black nine-millimeter semiautomatic Glock handgun in a "spare room" containing a futon, computer system, and set of keys. Defendant did not occupy that room. However, defendant said the gun and keys belonged to him. He stated the receipt for the gun was in a safe in the residence. The officers did not find it. A box of nine-millimeter ammunition was found in the room where Gustavo Oliver slept.

On the day of the search, Ammerman told Ta she had previously seen a gun on the premises when other people were staying in the house. She did not know if the nine-millimeter Glock was the gun she had seen. At trial, she denied telling anyone during the search that the seized gun was defendant's. She also denied saying the gun she had previously seen was black.

Defendant told officers that he did not know Bolli well. Bolli rented a house from defendant's parents and, as far as defendant knew, was still living there. Defendant refused further talk without legal representation.

Also on December 7, Ta interviewed Gustavo Oliver and asked him if defendant was present at the October 23 assault. Oliver said defendant had been present, but he did not know if defendant had brought a gun. Oliver said he could not see who was firing the shots. Ta stated he asked Oliver who owned the gun found during the December 2000 search of defendant's house. Oliver told him it was defendant's. Oliver also said he had seen defendant cleaning a gun at the residence and he assumed the gun was defendant's. Oliver testified he had been living in defendant's house for a month or two before the search. He said police told him they found a gun but he denied it was his. Oliver testified he did not know who owned the gun police found or who brought it to the house.

On January 2, 2001, after Bolli had been released from custody, he went on his own initiative to see Detective Ta. Ta was surprised to see Bolli, who told him that on Christmas day, Bolli had driven by defendant's home and defendant had invited him inside. He was apprehensive, particularly because Gustavo Oliver, who had kicked him in the head, might be there. Nevertheless, Bolli went inside. Defendant apologized to him and said he was very sorry for what had happened. He said he had been high on drugs at the time of the shooting. Bolli said defendant seemed embarrassed and lowered his head when Bolli showed defendant his injuries. Later, on May 15, 2001, Bolli identified photos of Gustavo Oliver as the person who had kicked him in the head, and Edgardo Oliver as the person who accompanied Gustavo.

5

>Defense investigator Edwin Anderson interviewed Bolli on November 7, 2001, and on March 27, 2002. At the second interview Bolli said that when the shooting occurred, he was under the influence of methamphetamine and he had been intoxicated for about two days. He remembered a shot having been fired, but he did not see defendant. He denied telling Ta that he recognized the shooter's voice and that he saw the shooter remove his ski mask. He said that the eyeholes of the ski mask that he saw on October 23, 2000, were different from the ski mask he had previously seen when he shared a residence with defendant.

### 2. THE VEHICLE STOP ON JANUARY 25, 2003.

Counts 4 through 12 against defendant arose from a vehicle stop on January 25, 2003. The following background facts describing that incident are taken verbatim from the opinion of the California Court of Appeal:

>On January 25, 2003, at approximately 12:20 a.m., San Jose Police Officer Michael Johnson saw a Mercury Cougar parked in front of a 7-Eleven store. The car's engine was running, but no one was inside. The only person around the car was defendant, who was kneeling by the open driver side door with his hands on the back of the driver's seat. Johnson drove his marked patrol car next to defendant's location and stopped for a couple of seconds. Defendant looked at him and appeared nervous. Johnson drove away and watched the car from a distance. One to three minutes later, codefendant Vanessa Danilloff came out of the store and got into the driver's seat. Defendant got into the passenger side and the car drove off. Johnson followed the car for about one car length and noticed several equipment violations. He formed the intention to stop the car, but before he could turn on his emergency equipment, the car pulled over into a "no stopping" zone.
>
>Both defendants exhibited symptoms of being under the influence of a stimulant and they were asked to exit the vehicle. A search yielded a .25-caliber semiautomatic handgun loaded with a magazine with one round in the chamber from the compartment in the back of the driver's seat where Johnson had seen defendant's hands, and some makeup, a cigarette case containing five empty Ziploc baggies, each about an inch square, a cigarette lighter, two plastic bags containing methamphetamine, and several empty bags in a cosmetics case sitting on the driver's seat. There was no residue in the small baggies. They were only big enough to hold about a quarter gram of methamphetamine, a single dose, which would sell on the street for about $25. He also saw a cell phone and a glass pipe for smoking methamphetamine in a sunglasses case on the floor of the car behind the driver's seat. The handgun was registered to a Rose Frances Martinez.
>
>Danilloff told Johnson she had looked in the driver's seat and saw the barrel of a gun sticking out from inside the seat. Danilloff said she pushed the gun inside the seat, pushed the panel to close the opening of the seat, and went inside the 7-Eleven store. When she

6

> came out, she drove away from the 7-Eleven, saw Johnson behind her, and pulled over to the side of the road.
>
> Both defendants were arrested. Defendant had a pager in his pocket and $73. Blood and urine samples from both defendants tested positive for methamphetamine. Both plastic bags tested positive for methamphetamine. The small bag had a net weight of .51 grams and the large bag weighed 13.97 grams.

## ANALYSIS

As grounds for federal habeas relief, petitioner advances the following claims: (1) that the joinder of charges involving events on October 23, 2000, December 7, 2000, and January 25, 2003, was improper, (2) that petitioner's trial counsel was constitutionally ineffective, (3) that the prosecutor improperly asked questions for which he had no basis in fact and no intention of proving, (4) that there was insufficient evidence to convict petitioner, and (5) that the trial court improperly sentenced petitioner because it failed to have the jury determine whether any mitigating factors existed to decrease petitioner's sentence.

### 1. STANDARD OF REVIEW.

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. 2254(d).

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El*, 537 U.S. at 340. This presumption is not altered by the fact that the finding was made by a state court of appeals, rather than by a state trial court. *Sumner v. Mata*, 449 U.S. 539, 546–47 (1981); *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir. 2001), *amended*, 253 F.3d 1150 (9th Cir. 2001). A petitioner must present clear and convincing evidence to overcome Section 2254(e)(1)'s presumption of correctness. Conclusory assertions will not suffice.

Under 28 U.S.C. 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion, which in this case is that of the California Court of Appeal. *See Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n.2 (9th Cir. 2000).

### 2. JOINDER OF CHARGES.

Counts 1 and 2 against petitioner relate to the shooting of Robert Bolli on October 23, 2000. Count 3 relates to the seizure of a black nine-millimeter Glock pistol during the search of petitioner's residence on December 7, 2000. Counts 4 through 12 relate to the seizure of a .25-caliber Beretta pistol and methamphetamine from a compartment on the back of the driver's seat of a vehicle in which petitioner was a passenger on January 25, 2003.

Petitioner claims that the trial court improperly granted the prosecution's motion to consolidate charges arising from the incidents on those separate dates and then improperly denied his severance motion when he argued that the evidence involving guns and drugs relating to some counts would spill over to other counts, unduly prejudicing the jury against him. In his habeas motion, petitioner alleges that he is entitled to a writ of habeas corpus because this joinder was improper and prejudicial.

Habeas relief on a joinder challenge may be granted only if the joinder resulted in an unfair trial. There is no prejudicial constitutional violation "unless simultaneous trial of more than one offense actually rendered petitioner's state trial fundamentally unfair and hence, violative of due process." *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004). Petitioner has the burden to prove unfairness rising to the level of a due process concern. *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

The requisite level of prejudice is reached only if the impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict. Each count is

8

evaluated separately for whether the trial on that particular count was fundamentally unfair in light of that count's joinder with one or more other charges. "In evaluating prejudice, the Ninth Circuit focuses particularly on cross-admissibility of evidence and the danger of 'spillover' from one charge to another, especially where one charge or set of charges is weaker than another." *Davis*, 384 at 638.

On direct appeal, the California Court of Appeal found that there was no misjoinder because the evidence in support of the various charges in the consolidated information were cross-admissible and there was no danger of spillover from a strong charge to a weaker one (Exh. E-4 at 13, 17). This order agrees.

Evidence related to the crimes committed on October 23 (Counts 1 and 2) and December 7 (Count 3) was cross-admissible because it showed that they were connected in their commission. The victim of the October 23 shooting, Bolli, had stated that the Glock found in the December 7 search was used in the October 23 assault (*id.* at 3). Although there was other evidence that the gun used in the October 23 assault was a .40-caliber semiautomatic weapon, it was properly up to the jury to decide if that Glock was used. Moreover, evidence of petitioner's unlawful possession of a handgun on December 7 (Count 3) and a handgun and methamphetamine on January 25 (Counts 7 through 12) was cross-admissible under California law to negate the possibility of a defense of mistake of fact by establishing that petitioner knew he had and intended to have things he could not legally possess (*id.* at 13).

Nor was evidence in support of any count used to bolster weaker counts because there was ample evidence to support all counts. Petitioner argues that he was prejudiced because Counts 1 and 2 were weak and were improperly bolstered by a "spillover" effect from the other charges. He asserts that other than Victim Bolli's statements to Detective Ta (which he later attempted to retract), there was no evidence that he was the shooter. The jury, however, could have chosen (and apparently did) not believe the retraction in favor of Victim Bolli's prior inconsistent statements. There was also other evidence besides Victim Bolli's statements (independent of the charges arising out of December 7 and January 25) that supported the jury's

9

1 finding that petitioner was the shooter: Gustavo Oliver placed petitioner at the scene of the
2 shooting (*id.* at 6).

3 Petitioner argues that the jury must have been unable to compartmentalize the evidence
4 presented on different counts because he was convicted on all counts. It is true that the Ninth
5 Circuit stated in an opinion regarding misjoinder of defendants that "the best evidence of the
6 jury's ability to compartmentalize the evidence is its failure to convict all defendants on all
7 counts." *United States v. Baker*, 10 F.3d 1374, 1387 (9th Cir. 1993). But the Ninth Circuit has
8 never suggested that misjoinder should be presumed merely because a jury convicted on all
9 counts. By contrast, it has held that there was no misjoinder of claims, even where defendant
10 was convicted of charges arising from separate incidents where the trial court gave an
11 instruction directing the jury to consider each count separately. *Davis v. Woodford*, F.3d 628,
12 639 (9th Cir. 2004) (holding that there was no misjoinder of claims where jury was instructed to
13 consider each count separately). Notably, the trial court in the present matter also specifically
14 so instructed the jury (Exh. A-2 at 480). There was no improper joinder here.

**3.     PROSECUTORIAL MISCONDUCT.**

Petitioner alleges prosecutorial misconduct, claiming that on two occasions the
prosecutor directed questions to a witness which suggested the existence of facts which were
harmful to petitioner's case and for which the prosecutor had no good faith belief that such facts
could be proven. Both of these questions were directed to Victim Bolli.

The first challenged question occurred during the prosecution's direct examination of
Victim Bolli (Exh. C-2 at 183):

> Q:  Did you tell Detective Ta that you were afraid for your family if you testified against LeGrande?
>
> A:  Yeah.

The second challenged question also occurred during Victim Bolli's direct examination (*id.* at 199).:

> Q:  Okay. What else did you tell him [Detective Ta] about your fears related to this incident?
>
> A:  I believe I told him about my family, too. That was one of questions you asked me yesterday.

10

In support of his claim that the prosecutor had no good faith basis for believing that Victim Bolli feared for his family, petitioner points to trial testimony by Victim Bolli that he had made up parts of his statements to Detective Ta (*id.* at 182). Victim Bolli told Detective Ta during an interview that Gustavo and Edgardo Oliver had been involved in assaulting Bolli in October 2000. At trial, Victim Bolli said he had made up this story because he was facing a state prison sentence at the time and thought he might go free if he provided information to law enforcement.

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Under *Darden*, the first issue is whether the prosecutor's remarks were improper. Courts in federal habeas cases review claims of prosecutorial misconduct "to determine whether the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Hall v. Whitley*, 935 F.2d 164, 165 (9th Cir. 1991).

This allegation was addressed by the California Court of Appeals in its opinion on direct appeal, affirming the judgment (Exh. E-4 at 18–19). This order agrees that judges must be vigilant to prevent the practice of counsel's including prejudicial assumed facts or statements in "questions" unless counsel intends and does prove it. Petitioner, however, has not established here that the prosecutor's remarks were beyond the pale. The record clearly substantiates a basis upon which the prosecutor could have held a reasonable good-faith belief that the facts incorporated into his questions could be proven, namely, that Victim Bolli was fearful of petitioner and reported his fear to Detective Ta.

For example, according to Victim Bolli's testimony, he told Detective Ta that petitioner was present during the shooting, and he "probably" told Detective Ta that petitioner was the person who had shot him (Exh. C-2 at 164, 183). Additionally, he testified that he had told Detective Ta that the reason he did not immediately report the shooting was because he was afraid petitioner might try to shoot him again (*id.* at 173–74). He also told Detective Ta that he was afraid to enter petitioner's residence when petitioner invited him inside on Christmas Day, about two months after the shooting (*id.* at 179–83).

11

Victim Bolli furthermore gave unqualifiedly affirmative answers to the prosecutor's questions about whether or not he was afraid of what petitioner might do to him or his family. This supports the conclusion that any insinuations suggested by the questions were genuinely held by and could be proven by the prosecutor. Petitioner cannot show that the questions at issue so infected the trial with unfairness as to make the resulting conviction a denial of due process.

### 4. EFFECTIVENESS OF COUNSEL.

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Ibid.* In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things. *First*, he must establish that counsel's performance was deficient, *i.e.*, that it fell below an "objective standard of reasonableness" under professional norms. *Id.* at 687–88. *Second*, he must establish that he was prejudiced by counsel's deficient performance, *i.e.*, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Where the defendant is challenging his conviction, the appropriate question in determining prejudice is "whether there is a reasonable probability that, absent the errors, the fact-finder would have had a reasonable doubt respecting guilt." *Luna v. Cambra*, 306 F.3d 954, 961 (9th Cir. 2002). A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies. *Strickland*, 466 U.S. at 697.

*First*, petitioner claims that counsel was ineffective because he failed to object to the prosecutor's questioning of Victim Bolli about his fear of petitioner. As noted above, the record affirmatively refutes the allegation that the prosecutor questioned Victim Bolli in a way that insinuated facts that were not in the record or that the prosecutor could not, in good faith,

12

1  believe that he could prove. It follows that trial counsel did not commit ineffective assistance of
2  counsel by failing to object on that ground was also necessarily correct.

3  *Second*, petitioner claims that counsel was ineffective because he failed to introduce
4  evidence at trial that neither petitioner nor co-defendant Danilloff was the registered owner of
5  the Mercury Cougar in which were discovered the .25 caliber pistol and methamphetamine that
6  form the basis of Counts 4 through 12. During a pretrial motion to suppress the fruits of the
7  vehicle search, petitioner testified that the owner of the Mercury was "a friend and business
8  partner or something like that" named Steven Garcia (Exh. C-1 at 4). Petitioner argues that
9  counsel should have introduced evidence at trial that Garcia owned the car and that co-
10 defendant Daniloff was merely test-driving it.

11  Petitioner seeks an evidentiary hearing regarding whether his trial counsel's failure to
12 present evidence that Steven Garcia was the Mercury's true owner fell below an "objective
13 standard of reasonableness" under professional norms. Petitioner is not entitled to such an
14 evidentiary hearing, however, because he failed to develop a factual basis for his claim in state
15 court. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which governs
16 this case, prohibits an evidentiary hearing where a petitioner has not been diligent in pursuing
17 his claims in state court. 28 U.S.C. 2254(e)(2). "Diligence . . . depends upon whether the
18 prisoner made a reasonable attempt, in light of the information available at the time, to
19 investigate and pursue claims in state court," and requires "in the usual case that the prisoner, at
20 a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law."
21 *Williams v. Taylor*, 529 U.S. 420, 435 (2000).

22  Although petitioner raised an ineffective assistance of counsel claim in his direct appeal
23 and in his petition for review to the California Supreme Court, he did not seek an evidentiary
24 hearing in his state court proceedings (Exhs. E-1 at 28–30, E-3 at 22–25, F-1 at 21–23).
25 Petitioner did not raise an ineffective assistance of counsel claim in his state habeas petition.
26 This amounts to a lack of diligence under AEDPA that "removes from the district court's
27 discretion the decision to grant or deny a request for an evidentiary hearing." *See West v. Ryan*,
28 608 F.3d 477, 484 (9th Cir. 2010).

13

Moreover, petitioner has failed to establish a colorable claim for relief by alleging facts that, if true, would entitle him to habeas relief. In particular, he was failed to satisfy *Strickland*'s two-pronged test as described above. Judicial scrutiny of counsel's performance must be highly deferential, and courts must indulge a strong presumption that counsel made all significant decisions in the exercise of reasonable professional judgment.

The record here does not reveal why petitioner's trial counsel did not present evidence regarding the identity of the registered owner of the Mercury or that petitioner and his co-defendant were merely test-driving the car. Aside from petitioner's own testimony at the pretrial suppression hearing, the record does not contain *any* evidence regarding who owned the vehicle or whether petitioner and his co-defendant were test-driving it. The pretrial suppression motion indicates that trial counsel was aware of petitioner's assertion, but petitioner did not testify at his trial. There could have been sound tactical reasons here why trial counsel would not have called petitioner to testify before the jury and repeat the testimony he had given at the pretrial suppression hearing that Steven Garcia was the owner of the Mercury.

Petitioner also has not identified in an offer of proof any evidence — other than petitioner's testimony — that counsel could have used at trial to establish Steven Garcia's ownership of the Mercury. Petitioner could not have compelled his co-defendant to testify. There is nothing in the record to indicate whether the purported owner Steven Garcia was available or willing to testify, nor what he would have said if called. Nor has petitioner made an offer of proof that documentary evidence exists regarding Steven Garcia's ownership of the Mercury.

For these reasons, even if petitioner's claim were *not* procedurally defaulted, petitioner's claim would nevertheless fail because he has not shown that he was prejudiced by trial counsel's actions: particularly, he has not shown that trial counsel's allegedly deficient performance created a reasonable probability that the result of the proceeding would have been different.

**5.    SUFFICIENCY OF EVIDENCE.**

14

Petitioner claims that the evidence at his trial was insufficient as a matter of law to convict him of any of the counts for which he was convicted. A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992). The federal court "determines only whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted. *Jackson*, 443 U.S. at 324.

Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995). After AEDPA, a federal habeas court applies the standards of *Jackson* with an additional layer of deference. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). Generally, a federal habeas court must ask whether the operative state court decision reflected an unreasonable application of *Jackson* and *Winship* to the facts of the case. *Id.* at 1275 (quoting 28 U.S.C. § 2254(d)). In other words, if the state court affirms a conviction under *Jackson*, the federal court must decide whether the state court's application of *Jackson* was objectively unreasonable. *Sarausad v. Porter*, 479 F.3d 671, 677–78 (9th Cir. 2007).

In the present matter, the California Court of Appeal rejected petitioner's contentions that the evidence at his trial was insufficient, finding that the evidence on all twelve counts against him was "substantial" (Exh. E-4 at 26). The standard of review employed by the California Court of Appeal expressly follows the federal standard for reviewing sufficiency of the evidence claims (Exh. E-4 at 25). The decision of the California Court of Appeal decision was not objectively unreasonable.

### A. Counts 1 and 2.

Petitioner contends that the evidence was insufficient to link him to the assault offenses in Counts 1 and 2 which were alleged to have occurred on October 23, 2000. He notes that no gun was ever found that matched the .40 caliber shell casings found at the scene of the shooting.

15

1   He also notes that at trial Victim Bolli recanted the pretrial statements which he gave to
2   Detective Ta that identified petitioner as the shooter.  Petitioner argues that therefore there is
3   insufficient evidence to support Counts 1 and 2 and those convictions must be reversed.

4   There was, however, sufficient evidence that petitioner *was* the shooter to support those
5   two convictions.  Victim Bolli told Detective Ta prior to trial that petitioner had shot at him,
6   and that two rounds struck the ground near him, causing shrapnel and pebbles to strike him in
7   the legs and injure him (Exh. C-4 at 354–57).  Detective Ta testified that Victim Bolli identified
8   petitioner by name as the shooter (*id.* at 354).  Victim Bolli told Detective Ta that after the
9   shooting, petitioner apologized for shooting him (*id.* at 360–62).  Prior to trial, Victim Bolli
10  identified petitioner from a photo lineup as the person who shot him (*id.* at 357–58).  Gustavo
11  Oliver testified told the police that petitioner accompanied him and Gardo Oliver when they
12  went to confront Victim Bolli and the shooting occurred (Exh. A-2 at 321).

13  Even though Victim Bolli and Gustavo Oliver denied knowledge about the identity of
14  the shooter at trial and were impeached by their prior inconsistent statements, it was an issue of
15  fact for the jury to decide whether their testimonies at trial or earlier statements were more
16  believable.  The state appeals court was reasonable to conclude that a rational jury could have
17  found that defendant was the shooter beyond a reasonable doubt.

18  **B.     Count 3.**

19  Petitioner contends that the evidence was insufficient to link him to the gun which was
20  found during the search on December 7, 2000.  He notes that the gun was not found in his
21  bedroom but in a guest room, that the evidence showed other persons stayed in the house at
22  various times, that there was no indicia of ownership such as a receipt to prove that petitioner
23  owned or possessed the seized firearm, and that bullets of the same caliber as the gun were
24  found in Gustavo Oliver's room.

25  But other evidence supported petitioner's conviction.  When Detective Ta asked the
26  three occupants of the house if anyone in the house owned the gun, petitioner admitted the gun
27  belonged to him (Exh. C-4 at 365–66).  Although they denied knowing who owned the gun at
28  trial, detective Ta testified that prior to trial, petitioner's girlfriend and Gustavo Oliver told him

16

in a prior inconsistent statement that the gun belonged to petitioner (*id.* at 366, 373). The state appeals court was reasonable to conclude that a rational jury could have found that defendant owned the gun.

### C. Counts 4–12.

Petitioner contends that the evidence was insufficient to support his conviction of the drug and firearm offenses charged in Counts 4 through 12, relating to the traffic stop on January 25, 2003. He contends that the evidence merely showed that he was a passenger in a vehicle which had a secret compartment behind the car seat from which drugs and a firearm were seized. He argues that the evidence was insufficient to establish that he knew of the secret compartment or had knowing possession of the drugs and weapons that form the basis for Counts 4 through 12.

Circumstantial evidence supports the jury's verdicts as to Counts 4 to 12. Officer Johnson saw petitioner alone outside the car parked in front of a 7-Eleven, kneeling by the open driver's side door, with his hands on the back of the driver's seat (C-4 at 400–02, 427–28, 435–36, 438, 441, 461–62). When he saw the officer, he looked nervous (*id.* at 428). These facts support a finding that petitioner had knowledge of the illegal stash hidden behind the driver's seat. Furthermore, Officer Johnson concluded that petitioner was under the influence of methamphetamine based on his rapid speech pattern, constricted and non-reactive pupils, fluttering eyelids and an elevated pulse rate (*id.* at 405–08). Petitioner's blood also tested positive for methamphetamine (*id.* at 418). The jury could have reasonably determined that this circumstantially supported his knowledge of the methamphetamine and other contraband in the car. The state appeals court was thus reasonable to conclude that a rational jury could have found petitioner guilty of Counts 4 through 12.

### 6. SENTENCING.

Petitioner's final claim is that he was improperly sentenced. In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court held that any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. *Id.* at 488–90. In *Blakely v. Washington*, 542 U.S. 296 (2004), the Supreme

17

1 Court explained that "the statutory maximum for *Apprendi* purposes is the maximum sentence a
2 judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the
3 defendant." *Id.* at 303. This meant that the "middle term prescribed in California's statutes, not
4 the upper term, is the relevant statutory maximum." *Cunningham v. California*, 549 U.S. 270,
5 273 (2007). In *Cunningham*, the Supreme Court cited *Apprendi* and *Blakely* and held that
6 California's determinate sentencing laws violated a defendant's right to a jury trial to the extent
7 that it contravenes "*Apprendi*'s bright-line rule: Except for a prior conviction, 'any fact that
8 increases the penalty for a crime beyond the statutory maximum must be submitted to a jury,
9 and proven beyond a reasonable doubt.'" *Id.* (quoting *Apprendi*, 530 U.S. at 490).

The trial court sentenced petitioner as follows. Petitioner received an aggregate prison sentence of 16 years and eight months. For Count 1 (assault with semiauthomatic firearm), he received a middle term of six years plus a four-year personal use enhancement. For Count 2 (assault with a firearm), he received a middle term of three years plus an additional four-year personal use enhancement. For Count 3 (possession of a firearm by a felon), he received a middle term of two year. For Court 4 (transportation of methamphetamine), he received a middle term of three years. For Count 5 (possession of methamphetamine for sale), he received a middle term of two years. For Count 6 (possession of a false compartment with intent to store a controlled substance), he received a middle term of two years to be served concurrently. For Count 7 (possession of a controlled substance while armed with a loaded, operable firearm), he received a middle term of three years to be served concurrently. For Count 8 (carrying a concealed firearm in a vehicle by a felon), he received a middle term of two years to be served concurrently. For Count 9 (carrying a concealed firearm), he received a middle term of two years stayed pursuant to California Penal Code § 654. For Count 10 (carrying a loaded firearm by a felon), he received a middle term of two years stayed pursuant to California Penal Code § 654. For Count 11 (carrying a loaded firearm), he received a middle term of two years stayed pursuant to California Penal Code § 654. For Count 12 (personal possession of a loaded, operable firearm while under the influence of methamphetamine), he received a middle term of

two years to be served concurrently. The court additionally imposed a two-year on-bail enhancement and a three-year enhancement for a prior drug conviction (Exh. A-3 at 649–53).

*First*, petitioner argues that by ordering several of his sentence terms to run consecutively "without a jury first deciding whether there are aggravating facts sufficient to justify such a sentence." This claim has been expressly rejected by the Supreme Court in *Oregon v. Ice*, 129 S.Ct. 711 (2009). "The decision to impose sentences consecutively is not within the jury function that 'extends down centuries into the common law.'" *Id.* at 717 (quoting *Apprendi*, 530 U.S. at 477).

*Second*, petitioner argues that for each of his twelve convictions, *Cunningham* required that the determination whether to impose the middle term instead of the lower term be made by a jury based on proof beyond a reasonable doubt as to the existence of various aggravating and mitigating factors. As noted above, the Supreme Court has held that only facts that increase the penalty for a crime beyond the statutory maximum must be submitted to a jury and found beyond a reasonable doubt. Petitioner here was sentenced to the middle term — the statutory maximum — for each count. Since none of his sentence terms exceeded the prescribed statutory maximum, his right to a jury trial was not implicated and he is not entitled to statutory relief.

**CONCLUSION**

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED**. Rule 11(a) of the Rules Governing Section 2254 Cases requires a district court to rule on whether a petitioner is entitled to a certificate of appealability in the same order in which the petition is denied. Petitioner has failed to make a substantial showing that his claims amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would find this Court's denial

of his claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Consequently, no certificate of appealability is warranted in this case. The Clerk shall close the file.

**IT IS SO ORDERED.**

Dated: August 10, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE